DREW, J.
 

 | iPlaintiff, Shekeyla Tillman,
 
 [1]
 
 appeals from a summary judgment dismissing her medical malpractice lawsuit against Joel Eldridge, M.D. For the following reasons, we reverse the judgment of the district court and remand for further proceedings.
 

 
 *71
 
 Shekeyla’s daughter, Brianna, was born on February 21, 2002; the child lived with her mother in Wisner, Louisiana. No medical records of any kind are included in the appellate record, so the child’s medical history must be taken from other sources,
 
 [2]
 
 such as depositions and the medical review panel (“MRP”) opinion.
 

 According to Shekeyla, Brianna was generally a healthy child through her first 2½ years of life. However, in early October 2004, Brianna began to complain of stomach pain and began to lose weight. Shekeyla first took Brianna to a doctor, Thomas Colvin, M.D.,
 
 [3]
 
 on October 5, 2004. The child was anemic and did not improve after being seen.
 

 As the month went on, Brianna began throwing up, and she continued to lose weight and to have stomach pain. On October 18, Shekeyla took Brianna back to Dr. Colvin’s office, where the child was seen by a nurse practitioner.
 
 [4]
 
 At either this or the earlier visit, Shekeyla received a ^prescription for Phenergan suppositories to reduce nausea and perhaps another prescription as well, but it is not clear from the record what, if any, medicine was actually administered to the child. Brianna kept vomiting and was confined to her bed.
 

 By .October 24, Brianna’s condition had deteriorated; she was unable to keep down water or food. That day, Shekeyla took Brianna to the emergency room at Franklin Parish Hospital. The child was seen by Dr. Jorge Tapia, who performed a physical examination and ordered lab work and an X-ray. Dr. Tapia found no acute problem, although the lab work revealed high ke-tone and BUN levels. The child was able to keep down Pedialyte, so the doctor discharged her. According to Shekeyla, the doctor recommended oral rehydration pop-sicles. The MRP noted that the hospital records indicated that the doctor discharged the patient with unspecified verbal and written instructions.
 

 Brianna continued with the same symptoms for several more days and her health continued to decline. In the early morning hours of October 29, 2004, Shekeyla’s mother brought Brianna back to the emergency room of Franklin Parish Hospital. On this occasion, Shekeyla did not accompany her mother and child. The child’s grandmother reported that Brianna had vomited twice and was sleepy. At admission, Brianna had a fever of 101.2 degrees. This was the first instance of fever recorded in the medical records.
 

 At the hospital, Dr. Eldridge examined Brianna, but the doctor did not order any lab work or blood cultures. The doctor ordered a shot of |sPhenergan for vomiting and a Tylenol suppository for fever and then discharged the child. The doctor instructed the grandmother to give the child clear liquids and bring the child to her doctor the next day or to return to the emergency room if she did not improve.
 

 The child’s grandmother brought Brianna home. Later that morning, the child became unresponsive and stopped breath
 
 *72
 
 ing. An ambulance was summoned, but Brianna could not be revived, and she died early that afternoon.
 

 Shekeyla filed a medical malpractice claim against Dr. Tapia, Dr. Eldridge, and the hospital.
 
 [5]
 
 The MRP concluded that the care rendered by Dr. Tapia, insofar as could be determined from the records, was appropriate, with the caveat that the absence of written discharge instructions precluded a finding as to whether those instructions were appropriate. Likewise, as to Franklin Medical Center, the MRP concluded that the hospital’s treatment met the appropriate standard of care.
 

 However, the MRP concluded that Dr. Eldridge’s treatment failed to meet the standard of care. The MRP’s opinion stated:
 

 What is most concerning to the panel is that at the time of this visit, the patient was three plus (3 + ) weeks vomiting, was now febrile (101.2, where previously she had been afebrile) and lethargic (malaise and sleepy). These presentations in a two year old child are concerning. The panel finds a deviation in [sic] standard of emergency medicine care by Dr. Eldridge in not ordering appropriate blood work and culture tests and admitting the patient to the hospital for observation and consultation with a pediatrician. While this is a deviation in | ¿acceptable standard of care for emergency medicine, the panel cannot conclude this deviation was a factor in the child’s death. The autopsy and death certificate concluded [sic] cause of death as intracranial hemorrhages. The evidence does not indicate the cause of the hemorrhages. It would be conjectural for the panel to conclude differently from the autopsy report.
 

 * ⅜ *
 

 The evidence presented support [sic] the conclusion that the defendant, Joel El-dridge, M.D., failed to meet the applicable standard of care as charged in the complaint. The conduct complained of was not a factor in the alleged resultant damages.
 

 Subsequent to the rendition of the MRP opinion, Shekeyla filed suit against Franklin Medical Center, Franklin Parish Hospital, Dr. Tapia, and Dr. Eldridge.
 

 In September 2008, the parties took the deposition of Dr. Godfrey Achilihu, one of the MRP members. The doctor provided a detailed description of the child’s medical history taken from the available records and gave a comprehensive explanation of what would have been the appropriate medical treatment for the child. Indeed, one salient fact was disclosed in Dr. Achili-hu’s deposition which was not mentioned in the MRP opinion and which is not found in any other document in the record:
 
 the coroner who performed the autopsy on Brianna found the presence of staphylococcus, streptococcus and E-coli bacteria in the child’s bloodstream.
 
 In addition, the coroner found infected blood in the child’s stomach. Dr. Achilihu stated that the presence of these bacteria “would indicate some type of infection, the source of which we don’t know.”
 

 According to Dr. Achilihu, the standard treatment for bacterial infections is antibiotics. When asked if different treatment by Dr. Eldridge Lon October 29, 2004, would have improved the child’s chance of
 
 *73
 
 survival, the doctor responded at his deposition:
 

 In my opinion, the fact that you demonstrated organisms in the blood of this patient and also found hemorrhages in the brain suggests very strongly a link between the two, without a doubt. I don’t think any physician would argue against that. What the panel was trying to address there was whether the patient, when she was seen on the 24th and the 5th or even before that, — ... Even before the 29th. From the course of this patient’s illness, one can reasonably assume that this patient has been sick for a long time, because this patient was already having vomiting before ... she saw [her regular doctor]. So that suggests some degree of chronicity, suggests that this patient has been sick for a while. Now, whether this patient, during that period of time, has been infected with these organisms, or there was something else going on, it’s difficult to know. Your question is, How could we not say that, Well, if the patient was admitted in the hospital and something else done, that patient probably may not have died. That is true and untrue in the sense that there is no way to know that if you admitted this patient in the hospital on Day One, Day Two, Day Three, or Day Four, that they could not have died. And that’s why — that is why we reached that conclusion in the manner in which we reached it. Because we were — we were aware that something that — yes, whoever saw this patient at the terminal stage, there was enough indicators at that particular day to say, Well, you know, this guy [sic] has been coming here. Maybe — maybe we should just put him in and try to — refer him to somebody else or get an expert opinion, and that was it. And we couldn’t — we couldn’t say that at that particular day that he came in, failure to do that caused the patient to die because of that particular day’s visit. I don’t know if I’m making sense to you. So that — that was why we reached that conclusion in the manner we reached it. But clearly, it was — there was enough reason for us to believe that at that particular day — that particular day of that visit that that patient had enough reasons to be put in the hospital.... And maybe in the process certain things could have been done that may^ — may have indicated that there was something else going on with the patient other than just the vague idea of vomiting. Vomiting is not a disease. It’s a symptom of something. There was something going on, you know.
 

 16When asked if the cause of the vomiting would more probably than not have been discovered had the child been hospitalized, the doctor responded:
 

 Hospitalization and/or referral and/or more directed tests would have been most appropriate in the care of this patient. And probably — Could it — Would it have prevented death of the patient? Very difficult to say, but it would have been nice to do that.
 

 When asked if this would have increased the patient’s chance of survival, the doctor answered:
 

 It’s a possibility that if that was done and you found out what was wrong, if it wasn’t late enough, that — And if it was something where she had something treatable that you could offer some— some formal treatment that could affect the life of the patient, yes.
 

 When asked if admission to the hospital would have, more probably than not, prevented the child’s death, the doctor responded, “Even earlier. Even earlier, not just on the 29th. Yes.”
 

 
 *74
 
 The doctor explained that vomiting can cause brain hemorrhages. With regard to causation, the doctor further explained:
 

 Where we’re having trouble here is whether — for me and for most of the panel members, it was immaterial what — whether these organisms were what caused death of the patient, because that wasn’t really an issue in the sense that we were asked to determine whether the care given to this patient at any point in time was appropriate for this particular visit. It will be a stretch to say, Well, you found the organisms here. This is what caused the patient’s death. Because we do — We know that these organisms as described in the autopsy have potential cause of infection, and an infection that — in anybody who is not — which is not treated can cause death. So it’s — We didn’t think it was something we needed to link for — in the manner that you are trying to get me to say. But it’s — I think it was clearcut that we were focused on how the patient was cared for for each of the times that they saw the physicians or the health care providers or whoever they saw. We determined at what ^particular point in time something else could have been done. Now, anybody can make a link between that care and the outcome. That wasn’t what we set out to do.
 

 The doctor further stated:
 

 Remember that the very night that the patient died they had come to see, I think — Was it Dr. Eldridge? Okay. And I believe from records he had like maybe two — an hour or two or so that he spent with this patient, and patient went to him and came back dead. We— we weren’t — We felt that that patient that night could have been in — should have been in the hospital. Maybe someone has seen the patient or referred outside or something done. Now, what — If that was done, could it have prevented the death of this patient? In medicine, we don’t want to — In a case like this, we don’t — we don’t want to make assumptions and, you know, act by conjecture and say, Well, this — this could have happened. We were just stating the facts, meaning that we felt that at that particular time frame something else should have been done. Could it have led to this child living to today? We don’t know. There’s no way for us to know at what point this patient actually got sick to the extent that any type of care would have changed the outcome. That’s how — That was why we wrote the opinion in the way we wrote it.
 

 Finally, Dr. Achilihu explained:
 

 Again, I want you to not to be so definite as to what the autopsy might be saying and the cause of death. He [the coroner] can only describe the autopsy findings. And he saw that patient at the terminal stage after the patient has been dead. He can make an assumption and say, “This was this and this could have been from this and this is likely to cause death.” The patient had intracerebral hemorrhage. It wasn’t the only thing that the patient had. So you cannot look at that in isolation, and I caution that. You cannot look at an intracere-bral hemorrhage in isolation of the patient nor the blood findings nor the findings of the gastrointestinal tract.
 

 The plaintiff retained an independent physician, Dr. Terrance Baker, to review the medical records and give an expert opinion about the care given to Brianna. Dr. Baker is a physician board certified in,
 
 inter alia,
 
 family practice, emergency medicine, and forensic medicine. Dr. Baker | ¿found deviations from the standard of care by all of the medical defendants. With regard to the treatment provided by
 
 *75
 
 Dr. Eldridge, Dr. Baker’s affidavit concluded:
 

 9. It is my professional opinion that Dr. Joel Eldridge, MD deviated from the standard of care by:
 

 a. Failure to perform and record an adequate history of the presenting- illness, i.e. signs and symptoms which led Brianna D. Tillman to make office visits on 10/5/04, 10/18/04 and subsequent hospital emergency department visits on 10/24/04 and 10/29/04.
 

 b. Failure to perform and record adequate review of symptoms.
 

 c. Failure to conduct and record adequate physical examinations.
 

 d. Failure to recognize that Brianna D. Tillman’s history of fever, abdominal pain, vomiting for three (3) weeks requiring recurrent office visits and emergency department visits were consistent with the probability of a more serious underlying medical condition. Dr. Eldridge failed to recognize the significance of the historical and physical examination facts known to him during the 10/29/04 emergency department visit. The facts known include but are not limited to:
 

 — Presentation symptoms occurring for over three (3) weeks and were worsening.
 

 — Severity of abdominal pain associated with vomiting.
 

 — Progressive nature of patient’s symptoms despite treatment.
 

 — New onset of fever in a two (2) year old patient of unknown origin.
 

 e. Failure to emergently admit Brianna D. Tillman to the Franklin Medical Center with pediatric consultation for continued evaluation and treatment of her medical condition.
 

 f. Failure to emergently evaluate the differential diagnosis of possible causes of Brianna D. Tillman’s signs and symptoms including but not limited to:
 

 — CBC
 

 |s— Chemistry panel
 

 — Urinalysis
 

 — Chest x-ray
 

 — Abdominal Xr-ray
 

 — CT head
 

 — Lumbar puncture
 

 g. Failure to at anytime consider intra-cranial process in the patient’s differential diagnosis during the emergency department visit of 10/29/04. The severity of the patient’s signs and symptoms required by the standard of care further evaluation in the eniergency department or hospital setting. Dr. Eldridge was in a unique position to affect the natural course of Brianna D. Tillman’s disease process. Instead, Dr. Eldridge narrowed the differential diagnosis to fever and vomiting of unknown origin.
 

 h. Failure to provide Brianna D. Tillman’s family with the appropriate education that the exact cause of her signs and symptoms remained unknown during the emergency department visit of 10/29/04 and further evaluation would be required. Dr. El-dridge failed to provide the education that new onset of fever, lethargy associated with vomiting of three (3) weeks’ duration and abdominal pain are signs and symptoms of several more serious diagnoses and requires further emergent evaluation.
 

 i. Failure to admit Brianna D. Tillman to the hospital on 10/29/04. Progressive G.I. symptoms paired with a fever and lethargy in a two (2) year old required admission in a patient with the significant history and presentation of Brianna D. Tillman.
 

 
 *76
 
 j. Standard of care treatment for patients like Brianna D. Tillman with fever, lethargy, vomiting, and weight loss progressive over a three (3) week period requires thorough evaluation of the entire patient; formation of a prompt inclusive differential diagnosis; continued evaluation and re-evaluation of symptoms until a specific diagnosis is made or until possibilities such as intracranial process are ruled out. Dr. Eldridge deviated from the standard of care when he failed to pursue the evaluation of the patient’s presenting symptoms on 10/29/04. In-tracranial processes were part of the patient’s differential diagnosis of symptoms at the time of discharge from the emergency department on 10/29/04.
 

 |10k. Failure to document with such frequency and detail so as to demonstrate that the standard of care was met in the evaluation and treatment of Brianna D. Tillman.
 

 l. Failure to provide appropriate treatment during the course of the patient’s emergency department visit on 10/29/04 including IV fluids and medications. Instead, Dr. Eldridge prescribes Phenergan 12.5mg IM, which was a medication contraindicated by the patient’s condition during her emergency department visit [on] 10/29/04.
 

 m. Failure to consult a pediatrician and/or the patient’s family physician.
 

 n. Failure to diagnose intracranial hemorrhage by lumbar puncture and/or by CT head.
 

 o. Failure to reconcile differences between his examination and the physical examination of the nurses with whom he was working.
 

 Dr. Baker further stated in his affidavit, with emphasis added:
 

 10. Based upon a reasonable degree of medical certainty it is my opinion that Joel Eldridge, MD did not use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances.
 
 It is my opinion that these breaches in care caused a delay in the diagnosis of Brianna D. Tillman’s diagnosis resulting in her death later during the day of 10/29/01. Brianna D. Tillman’s death is a direct and proximate result of Dr. Joel Eldridge’s breaches in the standard of care.
 

 On August 4, 2008, Dr. Eldridge filed a motion for summary judgment. He argued that the plaintiffs had no proof that his conduct was the proximate cause of the patient’s death. To his motion, the doctor attached the plaintiff’s original complaint to the Patient’s Compensation Fund (“PCF”), the plaintiff’s amended complaint to the PCF, and a certified copy of the MRP opinion.
 

 _JjjThe plaintiff filed an opposition to this motion, arguing that she had sufficient proof of malpractice by Dr. Eldridge to require a trial on the merits. To her opposition, the plaintiff attached selections from the 104-page deposition of Dr. Achili-hu and his curriculum vitae; a certified copy of the MRP opinion; and the 11-page affidavit of Dr. Baker, partly quoted above, and his curriculum vitae. The record on appeal also contains a motion for summary judgment filed by Dr. Tapia and supporting exhibits which include the deposition of the plaintiff.
 

 The court held a brief hearing on October 2, 2008, on Dr. Eldridge’s motion for summary judgment. The court stated:
 

 [A]fter reviewing the memoranda filed by the parties as well as the affidavits filed by the defendant ... being an affi
 
 *77
 
 davit of a Dr. Baker ... the Court is recognizing that when I went to law school you — summary judgments were not good, now they’re good, and for that reason, the change in the law and in the case law and based on the fact that the affidavit of Mr. Baker, while extremely detailed with regard to a breach, does not adequately address, or it only addresses in a conclusory fashion causation, and it’s in the Court’s view not sufficient to raise an issue of fact that would be — could be presented to a jury, I’m going to grant the motion for summary judgment.
 

 The court also instructed the plaintiff that it would not accept only a partial deposition as an exhibit; the court said “it’s all or nothing,” so the plaintiff acquiesced to the court’s demand to include the doctor’s entire deposition with her opposition.
 

 From the judgment dismissing her action against Dr. Eldridge, the plaintiff now appeals. In her motion for appeal, the plaintiff stated that she “desires to designate the entire record of the Summary Judgment for appeal[.]” The plaintiff argues that the materials from both Dr. Achilihu 112and Dr. Baker show that genuine issues of material fact remain undecided and that adequate discovery had not been completed when the trial court made its ruling. Further, the plaintiff argues that the trial court erred in requiring her to submit the entire deposition of Dr. Achi-lihu and that the lower court also erred by sending the entire record to this court rather than only that part of the record relating to the motion for summary judgment filed by Dr. Eldridge.
 

 DISCUSSION
 

 In
 
 Somaha v. Rau,
 
 2007-1726 (La.2/26/08), 977 So.2d 880, the supreme court explained at length the burden of proof and standard of review in medical malpractice eases:
 

 To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.
 

 Although causation is not explicitly included among those elements for which proof must be made through expert medical testimony, typically expert testimony is required to prove causation when the resolution of that issue is not a matter of common knowledge.
 

 In
 
 Samaha,
 
 the court also explained the resolution of medical malpractice cases on summary judgment:
 

 A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. A summary judgment is | ^reviewed on appeal
 
 de novo,
 
 with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate;
 
 ie.
 
 whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. (Citations and footnote omitted.)
 

 La. C.C.P. art. 966(C)(2) provides:
 

 The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on
 
 *78
 
 the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 

 In
 
 Samaha,
 
 the court cited the explanation of the 1997 amendment to this article given in
 
 Wright v. Louisiana Power & Light,
 
 2006-1181 (La.3/9/07), 951 So.2d 1058:
 

 This amendment, which closely parallels the language of
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), first places the burden of producing evidence at the hearing on the motion for summary judgment on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent’s case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial.... Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. (Citation omitted.)
 

 Even though summary judgment is now favored, it is not a substitute for trial on the merits, and it is inappropriate for judicial determination of [ ^subjective facts, such as motive, intent, good faith or knowledge that call for credibility evaluations and the weighing of the testimony.
 
 S.J. v. Lafayette Parish School Bd.,
 
 2006-2862 (La.6/29/07), 959 So.2d 884. In deciding a motion for summary judgment, the court must assume that all of the affiants are credible.
 
 Davis v. Delta Bank,
 
 42,529 (La.App.2d Cir.11/7/07), 968 So.2d 1254,
 
 writ not cons.,
 
 2007-2473 (La.2/22/08), 976 So.2d 1276.
 

 In the instant case, Dr. Eldridge produced the MRP opinion in support of his motion for summary judgment. That opinion found that the panel could not conclude that Dr. Eldridge’s conduct or lack thereof caused the child’s death before stating finally that Dr. Eldridge’s conduct was not a factor in the damages resulting to Brianna.
 
 [6]
 
 In the doctor’s viewpoint, the opinion was adequate to “[point] out the lack of factual support for an essential element in the opponent’s case” and shift the burden of production of evidence to the plaintiff. We agree that the doctor’s evidence in support of his motion for summary judgment was minimally adequate to shift the burden of proof. Accordingly, in order to avoid the dismissal of her case, the plaintiff was required to “produce factual support sufficient to establish that she will be able to satisfy his evidentiary burden of proof at trial[.]” La. C.C.P. art. 966(C).
 

 The plaintiffs evidence in opposition to summary judgment included the deposition of Dr. Achilihu, who served on the MRP, and the affidavit of Dr. Baker, who had conducted an independent review of the medical records. Although the district court concluded that this evidence was
 
 *79
 
 | ^insufficient to satisfy the plaintiffs burden on summary judgment, we disagree.
 

 The trial court concluded that Dr. Baker’s affidavit, while specific in many respects, nevertheless was insufficient to overcome the MRP’s finding that Dr. El-dridge’s conduct had no causal connection with the child’s death because the affidavit was conclusory with respect to the issue of causation. The trial court correctly recognized that an affidavit that is merely conclusory is insufficient to serve as evidence; affidavits that are devoid of specific underlying facts to support a conclusion of ultimate “fact” are not considered legally sufficient to defeat summary judgment.
 
 Dumas v. Angus Chemical Company,
 
 31,400 (La.App.2d Cir.1/11/99), 728 So.2d 441,
 
 writ denied,
 
 1999-0751 (La.4/30/99), 741 So.2d 19.
 

 However, Dr. Baker’s affidavit is based directly upon specific facts some of which were included in and others omitted from the MRP opinion, but all of which Dr. Achilihu discussed at length in his deposition. Dr. Baker specifically found that Dr. Eldridge failed,
 
 inter alia,
 
 to timely conduct the variety of medical tests which would have aided in the differential diagnosis of this 2/É-year-old child who had a three-week history of vomiting and a newly emergent fever. Based in part upon that finding, Dr. Baker concluded that these failures caused a delay in the diagnosis of the child’s illness, resulting in the child’s death.
 

 That is a conclusion which Dr. Achilihu was unwilling to reach, but his deposition testimony explains and, frankly, seriously calls into question the statement in the MRP opinion that Dr. Eldridge’s conduct did not cause 11Bthe child’s death. Indeed, it appears that the statement in the MRP opinion finding no causation is of a more conclusory nature than Dr. Baker’s statement to the contrary. The MRP relied upon the absence of proof of a definitive causative agent for Brianna’s cranial hemorrhages as its basis for finding no causal link between Dr. Eldridge’s conduct and the child’s death. However, at his deposition, Dr. Achilihu noted that the finding of cranial hemorrhage could not be looked at in isolation from either the blood findings or the findings of the gastrointestinal tract. After a careful review of the MRP opinion, this court finds not even a mention of the “blood findings” — which included no fewer than three different bacterial infections — and the gastrointestinal finding of infected blood in the child’s stomach. As Dr. Achilihu said:
 

 [F]or me and for most of the panel members, it was immaterial what— whether these organisms were what caused death of the patient, because that wasn’t really an issue in the sense that we were asked to determine whether the care given to this patient at any point in time was appropriate for this particular visit.
 

 And further:
 

 Because we do — We know that these organisms as described in the autopsy have potential cause of infection, and an infection that — in anybody who is not— which is not treated can cause death. So
 
 it’s
 
 — We didn’t think it was something we needed to link for — in the manner that you are trying to get me to say. But it’s — I think it was clearcut that we were focused on how the patient was cared for for each of the times that they saw the physicians or the health care providers or whoever they saw. We determined at what particular point in time something else could have been done. Now, anybody can make a link between that care and the outcome. That wasn’t what we set out to do.
 

 Thus, the MRP’s focus was on the standard of care and whether any of the
 
 *80
 
 healthcare providers breached that standard rather than on whether the 117breach caused the child’s death, and this explains why the MRP’s conclusion about causation is not well explained in its opinion.
 

 Based upon the same information available to the MRP, Dr. Baker reached an opposite conclusion concerning causation: that the delay in the diagnosis of Brianna’s condition, caused by Dr. Eldridge’s breach in the standard of care, was the proximate cause of the child’s death. The MRP opinion inexplicably omits any mention of the autopsy findings of multiple infections in this child. Dr. Achilihu cautioned that the stated cause of death could not be looked at in isolation from the infections, yet an isolated treatment of the cause of death appears to be the support for the MRP’s determination of no causation. Thus, this record as a whole shows that there remain disputed issues of fact concerning the causation issue. Further, if accepted by the trier of fact, Dr. Baker’s opinion alone would be sufficient proof of causation to allow the plaintiff to prevail on the merits. Accordingly, the plaintiffs case against Dr. Eldridge is not ripe for summary judgment. In light of this decision, we find it unnecessary to address the plaintiffs other contention regarding lack of discovery.
 

 All court costs in the trial court and associated with this appeal are assessed to appellee, Dr. Joel Eldridge. La. C.C.P. art. 2164. Based upon that assessment, it is not necessary to reach the merits of plaintiffs assignments of error on the form and content of the record. However, we observe plaintiff complained that the trial court erred by requiring her to file into evidence the entire deposition of Dr. Achi-lihu rather than the excerpts she originally filed. As the opponent of a motion for summary judgment, | lsthe plaintiff was under no strict obligation to file any material whatsoever, but a failure to respond may mean that the plaintiffs case is dismissed. Although there is no requirement that the entirety of a deposition be submitted in support of or in opposition to summary judgment, in this case plaintiff was well served by the trial court’s action. As a matter of general practice, review of disputed issues is almost always greatly enhanced by the availability of the entire deposition of a witness rather than excerpts. The extent of the original filing by the plaintiff is not apparent from this record.
 

 Plaintiff also argued that the lower court erred by requiring the entire record be sent to this court rather than only the material filed in favor of and in opposition to Dr. Eldridge’s motion. La. C.C.P. art. 2128 allows the appellant to designate portions of the record which he desires to constitute the record on appeal. As noted, the plaintiff designated “the entire record of the summary judgment” for appeal. That designation is vague in scope and this two-volume record contains little material that is extraneous to the resolution of this dispute and only minimal duplication. We perceive no error by the trial court in that regard.
 

 DECREE
 

 For the reasons expressed above, the judgment of the district court granting summary judgment in favor of Dr. Joel Eldridge is hereby reversed, and this case is remanded for further proceedings. As noted above, the costs in the trial court and this court are assessed against the defendant.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Individually and on behalf of the estate of her minor daughter, Brianna Tillman.
 

 [2]
 

 . Not all of these sources were submitted with the summary judgment materials pertaining to Dr. Eldridge, but for the sake of clarity, the information is included in this opinion. However, all the factual information included in this opinion was taken only from the appellate record.
 

 [3]
 

 . This physician was not made a defendant in this action.
 

 [4]
 

 .The plaintiff’s amended complaint to the MRP, and her petition, allege that Dr. El-dridge examined Brianna during or soon after this visit but found nothing wrong and prescribed nausea medicine. This visit is not discussed in the MRP opinion and there are no medical records in the appellate record to help verify or refute this version of events.
 

 [5]
 

 . The MRP opinion refers to the hospital as Franklin Medical Center, but the plaintiff's petition refers to two separate entities, Franklin Medical Center (the location of the child’s regular doctor's office) and Franklin Parish Hospital (the location of the emergency room).
 

 [6]
 

 .
 
 See, e.g.,
 
 La. R.S. 40:1299.47(G)(4) and (H).