# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 21-153


ALLEN BROUSSARD, O/B/O RUDELL
BROUSSARD (D)

VERSUS

UNIVERSITY HOSPITAL & CLINICS, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20194145 "A"
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**********

**SHARON DARVILLE WILSON**
**JUDGE**

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, and Sharon Darville Wilson, Judges.


**REVERSED AND REMANDED.**

**Sera H. Russell, III**
**Jamie S. Thistlewaite**
**LAW OFFICES OF SERA H. RUSSELL, III**
**111 Mercury Street**
**Lafayette, LA 70503**
**(337) 769-3260**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Allen Broussard on behalf of Rudell Broussard (Deceased)**

**Bonnie Christie**
**Attorney at Law**
**1944 Norfolk Street**
**Houston, TX  77098**
**(832) 317-6587**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Allen Broussard on behalf of Rudell Broussard (Deceased)**

**Daniel Charles Palmintier**
**Attorney at Law**
**556 Jefferson Street, 4th Floor**
**Lafayette, LA 70501**
**(337) 262-1700**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Board of Supervisors of Louisiana State University & Agricultural &**
     **Mechanical College**

**Adam Paul Gulotta**
**JUDICE & ADLEY**
**P. O. Drawer 51769**
**Lafayette, LA 70505**
**(337) 235-2405**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Dr. Richard Vanbergen**

**Nicholas Gachassin, Jr.**
**Gary Delahoussaye**
**Chelsea Carroll**
**GACHASSIN LAW FIRM**
**(A Limited Liability Company)**
**200 Corporate Boulevard, Suite 103**
**Lafayette, LA 70598-0369**
**(337) 235-4576**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **University Hospital & Clinics**

**WILSON, Judge.**

Plaintiff, Allen Broussard (Mr. Broussard), appeals the grant of summary judgment dismissing the medical malpractice claim against Defendant, University Hospital & Clinics (UH&C), in connection with the death of his wife, Rudell Broussard (Mrs. Broussard). For the following reasons, we reverse the trial court's decision and remand this matter for further proceedings.

## I.

## ISSUES

The medical review panel changed its opinion based on deposition testimony of nurses taken after the panel proceedings. Mr. Broussard contends that he should be able to present this "changed" testimony to the jury to weigh whether the medical records or the nurses' testimony is correct. Mr. Broussard also contends that the report of his expert oncologist, Dr. Tyler Curiel (Dr. Curiel), was ignored by the trial court.

## II.

## FACTS AND PROCEDURAL HISTORY

Mrs. Broussard was diagnosed with Stage III triple negative invasive ductal carcinoma of the left breast, with no evidence of metastatic disease, on January 11, 2017. She was fifty-six years old. Her treating oncologist, Dr. Kelvin Raybon (Dr. Raybon), recommended chemotherapy treatment with Adriamycin and Cytoxan every two weeks for four cycles, followed by twelve-week doses of Taxon. After the chemotherapy regime was completed, Mrs. Broussard would be considered for a mastectomy.

On January 20, 2017, Dr. Aimee Hymel (Dr. Hymel) performed a procedure to insert the Mediport through which Mrs. Broussard would receive her

chemotherapy treatments.[1]  The procedure was performed without complication. Dr. Hymel's notes from the procedure indicate that the Mediport drew back easily and flushed easily, indicating that there was blood return and that the Mediport was functioning properly.   Dr. Richard Vanbergen (Dr. Vanbergen), a radiologist, reviewed an x-ray taken following the placement of the Mediport and concluded that the Mediport was properly placed.

On January 26, 2017, Mrs. Broussard presented to University Hospital and Clinics Oncology and Fusion Clinic (UH&C) for her first chemotherapy treatment. Despite noting that she was not getting any blood return from the Mediport, Nurse Michelle Briscoe (Nurse Briscoe) administered the full round of chemotherapy. Mr. Broussard contends that the chemotherapy medications were incorrectly delivered into Mrs. Broussard's mediastinum.

Three days later, on January 29, 2017, Mrs. Broussard went to the emergency department at UH&C with a complaint of shortness of breath.  She was admitted to the hospital with a diagnosis of pneumonia with right pleural effusion. She was treated with antibiotics and underwent a thoracentesis.[2]  Mrs. Broussard was discharged on February 7, 2017.

Mrs. Broussard presented to UH&C for her second round of chemotherapy on February 20, 2017.  Once again, the oncology nurse, Nurse Joni Acclis (Nurse Acclis) had problems obtaining blood flow from the Mediport.  Nurse Acclis called the oncology nurse practitioner, who ordered Cathflo.  According to her affidavit,

---

[1] Dr. Hymel was assisted by Dr. Jarret Brashear (Dr. Brashear).  Dr. Charles Chappuis, Jr. (Dr. Chappuis), was the attending physician when the procedure was performed.

[2] Thoracentesis is a procedure in which a needle is inserted through the chest wall into the pleural space (the thin gap between the pleura of the lung and the inner chest wall) to remove fluid or air from around the lung.

which was obtained after the panel proceedings, Nurse Acclis allegedly administered two rounds of Cathflo and was able to get blood flow through the Mediport. The chemotherapy treatment was started, but approximately five to ten minutes into the procedure, Mrs. Broussard became short of breath. The chemotherapy treatment was discontinued, Dr. Raybon was notified, and Mrs. Broussard was admitted to the hospital. Multiple x-rays were taken and showed a large right pleural effusion. Radiologists opined that the Mediport was still in the correct place.

Over the next two days, Mrs. Broussard underwent multiple thoracentesis procedures to remove significant amounts of fluid and blood serum from the pleural space on both sides of her lungs. CT scans were taken and reviewed by Dr. Raybon and Dr. Mohammed Kahn, a radiologist, who both expressed concern that the Mediport may have become displaced. On February 24, 2017, Dr. Hymel injected contrast into the Mediport. This procedure showed that the tip of the Mediport was not placed correctly. At that time, the Mediport was removed and replaced. X-rays confirmed the placement of the Mediport tip within the junction of superior vena cava with the right atrium. Mrs. Broussard was discharged on March 3, 2017.

Mrs. Broussard received her third, fourth, and fifth cycles of chemotherapy from March through April 18, 2017. Mrs. Broussard had some problems with infection, and chemotherapy was discontinued. Mrs. Broussard was admitted to UH&C but later transferred to Tulane Hospital, at her request, on May 12, 2017. She had respiratory issues and metabolic disturbances. Mrs. Broussard died on June 7, 2017, from cardiopulmonary arrest secondary to bilateral pleural effusions

3

with left lung empyema and hypoxia secondary to left breast ductal carcinoma, Stage III.

Mr. Broussard requested the formation of a medical review panel to review the treatment rendered by Dr. Vanbergen, Dr. Chappuis, Dr. Hymel, Dr. Brashear, UH&C, and Louisiana State University Health Sciences Center (LSUHSC).[3] The panel rendered its decision in June 2019, finding no breach of the standard of care by Dr. Vanbergen, Dr. Chappuis, Dr. Hymel, Dr. Brasher, or LSUHSC. The panel did find that UH&C breached the standard of care because its employees used the Mediport without ensuring that it was functioning properly. The panel, however, was of the opinion that this breach in the standard of care did not affect Mrs. Broussard's cancer or impact her chance of survival.

Following the panel's opinion, Mr. Broussard filed suit against Dr. Vanbergen, UH&C, and LSUHSC in the Fifteenth Judicial District Court. All of the claims against Dr. Vanbergen and LSUHSC were dismissed on summary judgments that were not appealed by Mr. Broussard.

Also following the panel opinion, counsel for UH&C deposed the oncology nurses, Nurse Briscoe and Nurse Danielle Malveaux, who treated Mrs. Broussard on January 26, 2017, after it was brought to their attention that pertinent information was allegedly missing from the medical records reviewed by the medical review panel. Nurse Briscoe testified that on January 26, 2017, she contacted the nurse practitioner and UH&C to report that she was unable to get blood return from Mrs. Broussard's Mediport. According to Nurse Briscoe, the nurse practitioner instructed her to contact Dr. Hymel, who ordered the administration of Cathflo and told Nurse Briscoe that if she was able to get blood

---

[3] LSUHSC employed Dr. Chappuis, Dr. Hymel, and Dr. Brashear.

flow from the Mediport after the administration of the Cathflo, then Nurse Briscoe could proceed with the chemotherapy. Nurse Briscoe testified that by 9:25 a.m., she had administered the Cathflo and was able to get blood flow from the Mediport. Nurse Briscoe then started Mrs. Broussard's chemotherapy treatment. Nurse Briscoe testified that she documented this in Mrs. Broussard's chart. Nurse Malveaux testified that she witnessed these actions by Nurse Briscoe.

This "newly acquired evidence" was presented to the medical review panelists, Dr. James Burke (Dr. Burke), Dr. Julie Cupp (Dr. Cupp), and Dr. Charles Lim (Dr. Lim). The panelists changed their opinions to reflect that: (1) it was reasonable and appropriate for the oncology nurse to contact the surgeon who installed the Mediport for further instructions; (2) it was reasonable and appropriate for Dr. Hymel to order Cathflo; and (3) it was reasonable and appropriate for the oncology nurses to proceed with the chemotherapy after using Cathflo without ordering further testing to verify placement of the Mediport. The panelists then signed affidavits stating that "[h]aving found that the administration of chemotherapy was reasonable and appropriate once the oncology nurses were able to get blood after giving Cathflo," the panelists were "of the opinion that [Mrs.] Broussard's recurrent thoracentesis procedures, the progression of her cancer, and her death were **not** caused by any breach of the standard of care applicable to University Hospitals and Clinics, [the Louisiana State University Health Sciences Center], or anyone affiliated with either institution" and "that [Mrs.] Broussard did not lose any chance of survival from the substandard conduct of University Hospitals and Clinics, the Louisiana State University Health Sciences Center, or anyone affiliated with either institution." (Emphasis added.)

5

Based on the depositions of Nurse Briscoe and Nurse Malveaux and the new affidavits from the panelists, UH&C filed a motion for summary judgment and a supplemental motion for summary judgment. UH&C alleged that Mr. Broussard could not produce expert medical evidence that any of the nurses, employees, or staff at UH&C breached the applicable standard of care under the then-existing circumstances. The original medical review panel opinion was also attached to UH&C's motion for summary judgment.

In opposition to the motion, Mr. Broussard presented the report of his expert oncologist, Dr. Curiel, and Mrs. Broussard's medical records. Mr. Broussard also filed a motion for summary judgment on the issue of liability and the necessity of the thoracentesis procedures. Mr. Broussard alleged that the panel's finding that UH&C fell below the standard of care in using a nonfunctioning Mediport necessitated a finding that the breach caused Mrs. Broussard to undergo multiple thoracentesis procedures.

The trial court granted UH&C's motion for summary judgment and supplemental motion for summary judgment while denying Mr. Broussard's motion for summary judgment. This appeal by Mr. Broussard followed.[4]

### III.

### STANDARD OF REVIEW

"Appellate courts review summary judgment *de novo* using the same criteria that governs the trial court's determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether

---

[4] Although Mr. Broussard's brief to this court states that: "Alternatively, the summary judgment filed herein by the plaintiffs should be granted[,]" the denial of the motion is neither assigned as error nor briefed. Issues not briefed on appeal are deemed abandoned. Uniform Rules—Court of Appeal, Rule 2–12.4.

6

the mover is entitled to judgment as a matter of law." *Dehart v. Jones*, 19-789, p. 4 (La.App. 3 Cir. 12/16/20), 310 So.3d 658, 664.

<h2 style="text-align:center">IV.</h2>

<h2 style="text-align:center">LAW AND DISCUSSION</h2>

In a medical malpractice case, the plaintiff bears the burden of proving: (1) the requisite standard of care; (2) a breach in the standard of care; (3) a causal connection between the breach in the standard of care and the injury alleged. La.R.S. 9:2794(A). In the context of a motion for summary judgment, "[t]he burden of proof rests with the mover." La.Code Civ.P. art. 966(D)(1). But, when "the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim[.]" *Id*. Instead, the mover must "point out to the court the absence of factual support for one or more elements of the adverse party's claim." *Id*. Once this is accomplished, the burden shifts to the adverse party to "produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." *Id*.

In *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (citations omitted), the Louisiana Supreme Court explained:

> A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits.

7

Summary judgment "is not a substitute for trial on the merits, and it is inappropriate for judicial determination of subjective facts, such as motive, intent, good faith or knowledge that call for credibility evaluations and the weighing of the testimony. In deciding a motion for summary judgment, the court must assume that all of the affiants are credible." *Tillman v. Eldridge*, 44,460, pp. 13-14 (La. App. 2 Cir. 7/15/09), 17 So.3d 69, 78 (citations omitted).

According to UH&C, "[t]he crux of plaintiff's claims against UHC is that Rudell Broussard's Mediport did not function properly because it did not aspirate blood and [that] UHC employees and staff were negligent in administering chemotherapy through the Mediport." UH&C argues that the deposition testimony of Nurse Briscoe and Nurse Malveaux along with the new affidavits from the panelists take away the crux of claims against it because the testimonies establish that the Mediport was functioning properly. UH&C asserts that the new affidavits from the panelists shift the burden of proof to Mr. Broussard to show that there is a genuine issue of material fact as to a breach.[5]

Mr. Broussard, on the other hand, contends that the conduct of the nurses was the main reason that the panel found that UH&C breached the standard of care but that after the nurses were deposed, the panel changed its opinion as to whether there was a breach by UH&C. Mr. Broussard argues that he has "the right to present this changed testimony to a jury for a jury to weigh whether the medical records or the nurses' new 'recovered memory' version of events is correct."

The trial court focused on whether the absence of a note in Mrs. Broussard's chart that the nurse successfully got a blood return before administering the

_____

[5] This court notes that the applicable standard of care is established by the medical review panel opinion in this case and that this opinion was attached to UH&C's motion for summary judgment.

8

chemotherapy was evidence that this did not happen so as to create an issue of fact for the jury. The trial court extensively questioned UH&C's counsel in this respect.

> THE COURT: Is there evidence in the record prior to the . . . initial submission to the medical review panel – Was there evidence in the record of a successful blood return in February?
>
> . . . .
>
> MR. DELAHOUSSAYE: The answer to that is no, and here's why: Because none of the players in the case knew that the blood return was the issue. Read Mr. Russell's complaint on behalf of the plaintiffs; nothing about the blood return.
>
> Had we know that was the issue that the panel was going to focus on and that would sort of guide the outcome in their mind against the hospital, that evidence would have been submitted.
>
> . . . .
>
> THE COURT: And wouldn't you expect – [h]ad the successful blood return been achieved, wouldn't you expect the record to have said so, that, "At such and such a time I successfully aspirated this blood and then administered the chemo"?
>
> MR. DELAHOUSSAY: Maybe, maybe not. But the fact that it's not in the record doesn't undercut what is clear and directly in front of the [c]ourt, and those are the affidavits from the two nurses that were involved. I mean, the testimony is under oath, and it is not contradicted by anybody in the case.
>
> . . . .
>
> THE COURT: But the record should show it[.]
>
> . . . .
>
> MR. DELAHOUSSAY: . . . The record isn't meant to be a chronicle of each and every step that each and every provider takes in the provision of healthcare[.]
>
> . . . .
>
> THE COURT: And these nurses understood, according to their testimony and/or affidavits, the importance of getting a successful blood draw before administering the chemo.

And it just seems that that's kind of a – [e]specially after two unsuccessful attempts to draw blood it would seem that the successful attempt, followed by the administration of chemo, would warrant inclusion in the chart.

The trial court then "reluctantly" granted UH&C's motion for summary judgment based on its finding that there was no evidence that UH&C breached the applicable standard of care. Mr. Broussard asserts that the change in the panelists' opinions and Dr. Curiel's report establish that there are genuine issues of material fact regarding whether UH&C breached the applicable standard of care. We agree.

In *Tillman*, 17 So.3d 69, two-year-old Brianna died after an undiagnosed illness. Brianna was seen by Dr. Joel Eldridge (Dr. Eldridge) in the emergency room with a history of fever and vomiting. Brianna had been seen by another doctor and nurse practitioner earlier in the month. Dr. Eldridge did not order any lab work or blood cultures and sent Brianna home with Phenergan and a Tylenol suppository. Later that day, Brianna became unresponsive and died. A medical review panel found that Dr. Eldridge's conduct did not meet the standard of care because he failed to order blood work and culture tests and did not admit Brianna to the hospital, but the panel did not find that Dr. Elridge's breach was a factor in Brianna's death from intracranial hemorrhages.

Brianna's mother filed suit in district court, and Dr. Eldridge filed a motion for summary judgment. The plaintiff's expert, Dr. Terrance Baker, issued an affidavit that Dr. Elridge's failure to timely conduct medical tests caused a delay in diagnosis that resulted in Brianna's death. The trial court found that Dr. Baker's affidavit was conclusory and insufficient to overcome the motion for summary judgment. The second circuit disagreed and found that the panel's opinion finding no causation was of a more conclusory nature than Dr. Baker's affidavit: "The

MRP relied upon the absence of proof of a definitive causative agent for Brianna's cranial hemorrhages as its basis for finding no causal link between Dr. Eldridge's conduct and the child's death." *Tillman*, 17 So.3d at 79. The second circuit stated:

> Based upon the same information available to the MRP, Dr. Baker reached an opposite conclusion concerning causation: that the delay in the diagnosis of Brianna's condition, caused by Dr. Eldridge's breach in the standard of care, was the proximate cause of the child's death. The MRP opinion inexplicably omits any mention of the autopsy findings of multiple infections in this child. Dr. Achilihu cautioned that the stated cause of death could not be looked at in isolation from the infections, yet an isolated treatment of the cause of death appears to be the support for the MRP's determination of no causation. Thus, this record as a whole shows that there remain disputed issues of fact concerning the causation issue. Further, if accepted by the trier of fact, Dr. Baker's opinion alone would be sufficient proof of causation to allow the plaintiff to prevail on the merits.

*Id.* at 80.

The new affidavits from the panelists and the new depositions of the nurses in this case, if anything, create issues of material fact regarding whether the nurses at UH&C complied with the applicable standard of care. The panel opinion specifically states that the nurses should have checked the Mediport, drawing back until they got blood flow, each time they sought to administer the chemotherapy. If no blood flow was obtained, this was an indicator that the Mediport was not functioning. The opinion further notes that the staff used the Mediport without requesting further investigation even after the medical oncologist was advised. According to the panel opinion: "The standard of care called for the nursing staff at UH&C to check and get blood back each time they sought to use the Mediport and notice if it was not functioning and not use it if it was not functioning properly."

The depositions of Nurse Briscoe and Nurse Malveaux were admittedly taken to cure deficiencies in Mrs. Broussard's medical records that arguably would have exonerated UH&C if such information had been contained in the medical records submitted to the panel. In the converse situation, generally, "a supplemental or subsequent affidavit in contradiction to prior deposition testimony is not sufficient to create an issue of fact precluding summary judgment without some explanation or support for the contrary statements." *Plant Performance Servs., LLC v. Harrison*, 17-1286, p. 12 (La.App. 1 Cir. 4/6/18), 249 So.3d 1, 8. Under the present facts, this court finds that the subsequent deposition testimony of the nurses and the panelists' changed opinions are insufficient to establish that there is no genuine issue of material fact regarding a breach in the standard of care when countered with the medical records that do not support the nurses' late recollection of the events.

## V.

## <u>CONCLUSION</u>

For the foregoing reasons, the trial court's judgment granting the motion for summary judgment filed on behalf of UH&C and dismissing all claims against it is hereby reversed. This matter is remanded to the trial court for further proceedings. All costs of this appeal are assessed to the defendant/appellee, UH&C.

**REVERSED AND REMANDED.**