| VINSON PULLIAM | * | NO. 2025-CA-0240 |
| --- | --- | --- |
| VERSUS | * | |
| | | COURT OF APPEAL |
| CURAHEALTH NEW ORLEANS, LLC | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-07714, DIVISION "E"
Honorable Omar Mason, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Tiffany Gautier Chase, Judge Dale N. Atkins, Judge Monique G. Morial)

 **CHASE, J., CONCURS IN THE RESULT**

Thomas L. Smith
ATTORNEY AT LAW
7805 Zimple Street
New Orleans, LA 70118


        COUNSEL FOR PLAINTIFF/APPELLANT, Belinda Pulliam and Vinson Pulliam, Jr.


Elizabeth S. Sconzert
Kelly M. Brian
BLUE WILLIAMS, LLP
3421 N. Causeway Blvd., Suite 900
Metairie, LA 70002


        COUNSEL FOR DEFENDANT/APPELLEE, Curahealth New Orleans, LLC


                                                **AFFIRMED**
                                        **DECEMBER 3, 2025**

*DNA*

*MGM*

This is a medical malpractice case. Appellants, Belinda Pulliam and Vinson Pulliam, Jr. ("the Pulliams"), seek review of the trial court's January 28, 2025 judgment, which granted the Motion for Summary Judgment filed by Appellee, Curahealth New Orleans, LLC ("Curahealth"), and dismissed the Pulliams' claims with prejudice. For the following reasons, we affirm the trial court's judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Petition for Damages

On July 24, 2019, Vinson Pulliam Sr. ("Mr. Pulliam") timely filed a Petition for Damages ("Petition") and listed Curahealth as the sole defendant.[1] Mr. Pulliam alleged that on May 4, 2018, he was a patient at University Medical Center ("UMC") in New Orleans and had undergone three surgeries, including one under his left knee cap to drain infectious fluid.[2] According to Mr. Pulliam, UMC transferred him to Curahealth on June 1, 2018, for physical therapy and antibiotics,

---

[1] As explained in the Pulliams' brief to this Court, prior to filing his Petition, Mr. Pulliam timely "filed a medical malpractice claim with the Commissioner of Administration, Division of Administration, Medical Review Panel Office." In response, "the Patient's Compensation Fund, State of Louisiana, Division of Administration, notified [Mr.] Pulliam that Curahealth [was] not qualified and [did] not have coverage in the Patient's Compensation Fund." Mr. Pulliam timely filed his Petition in accordance with La. R.S. 40:1231.8.

[2] Based on his Petition, Mr. Pulliam also underwent a surgery to remove a bone from his back and a surgery to his right foot and ankle.

1

at which time he was confined to a wheelchair. Mr. Pulliam alleged that on the evening of his transfer to Curahealth, he required assistance to move from his bed to his wheelchair, whereupon a registered nursed "started to lift him," but "Mr. Pulliam cautioned him [against] doing that." The Petition stated the nurse subsequently dropped Mr. Pulliam while attempting to lift him, whereupon "Mr. Pulliam hit the floor with his left leg underneath him, which was the leg on which [he] just had surgery at" UMC.

Mr. Pulliam stated in his Petition that he reported the incident to his treating physician at Curahealth, William St. John Lacorte, M.D. ("Dr. Lacorte"), the following day (June 2, 2018), specifically noting to Dr. Lacorte that he told the nurse to use a sliding board for transfer yet the nurse said the sliding boards were locked away and thus inaccessible. Mr. Pulliam further alleged in his Petition that he complained to Dr. Lacorte of severe pain to his left knee during this visit. Additionally, Mr. Pulliam alleged that he reinjured his left leg and knee as a result of the incident and continued to have problems with same at the time of the filing of the Petition.[3] The record reveals that after the filing of his Petition and prior to Curahealth filing a motion for summary judgment, Mr. Pulliam died of causes unrelated to the present suit.[4] The Pulliams, who are Mr. Pulliam's wife and son based on the record, ultimately took his place by moving forward with his lawsuit.

---

[3] On July 26, 2019, Mr. Pulliam filed a Supplemental and Amended Petition for Damages. Therein, Mr. Pulliam alleged Curahealth breached the medical standard of care by not having sliding boards available for transferring patients; by not having authorized personnel lift him from his bed to his wheelchair; by not taking proper precautions when transferring him from his bed to his wheelchair; and by not providing the proper training to its employees when transferring patients.

[4] According to the Pulliams' brief to this Court, Mr. Pulliam died in July 2023.

## Curahealth's Motion for Summary Judgment

On September 10, 2024, Curahealth filed its Motion for Summary Judgment, arguing summary judgment was appropriate because the Pulliams had not produced an expert witness to testify that Curahealth's conduct fell below the standard of care and to establish causation between the alleged malpractice and Mr. Pulliam's damages. Curahealth stated that "[t]he opinions of qualified medical experts are necessary to establish the" elements of a medical malpractice action, specifically "the applicable standard of care, whether that standard of care was breached, and whether that breach, if any, caused or contributed to the alleged injury sustained by the patient." Curahealth contended "[t]he sole instance in which expert testimony is not required is a case where a health care provider does an obviously careless act from which a layperson can infer negligence." In support of that statement, Curahealth cited to *Pfiffner v. Correa*, 1994-0924, 0963, 0992 (La. 10/17/94), 643 So.2d 1228. However, Curahealth asserted that the narrow exception delineated in *Pfiffner* did not apply in this case because "the alleged negligence involves complex medical issues necessitating expert testimony." In this regard, Curahealth noted Mr. Pulliam had "mobility and strength issues, as well as a history of joint pain and weakness" prior to the subject incident. In support of its Motion for Summary Judgment, Curahealth attached the following exhibits: A) Mr. Pulliam's Petition; B) Counsel for Mr. Pulliam's Answers to Interrogatories and Requests for Production of Documents (propounded in August 2021 and answered in June 2023); and C) Curahealth medical records for Mr. Pulliam.

In Exhibit B, in pertinent part, one of the interrogatories asked for the identification of any expert that might be called to provide expert testimony at trial

3

and the substance of the testimony to be offered.[5] Counsel for Mr. Pulliam responded with Dr. Lacorte's name and also listed "the nurse, whose name is unknown, who dropped" Mr. Pulliam. Thereafter, counsel for Mr. Pulliam stated the information "is shown in the medical records which [Curahealth] has in their possession."

In Exhibit C were records from Mr. Pulliam's admission to Curahealth on June 1, 2018. These stated, in pertinent part, that prior to undergoing his surgeries at UMC, Mr. Pulliam had been assaulted and "developed significant lower extremity weakness," such that he "was unable to walk."[6] The record further stated that after Mr. Pulliam's admission to UMC, "[h]e developed severe left knee pain and swelling" and "underwent [a] washout[]" on his left knee to eliminate an infection. Additionally, the record listed the impression for Mr. Pulliam's left knee as "septic joint." The record also listed Mr. Pulliam as "[p]ositive for . . . left knee pain" and "weakness to both lower extremities." As to Mr. Pulliam's lower extremities, the record also stated they were "very weak mainly due to pain with active range of motion." In addition, the records stated that Mr. Pulliam was to "participate in physical and occupational therapy" because "he remain[ed] severely deconditioned in both lower extremities." Finally, these records stated Mr. Pulliam had reported "severe pain," though the record did not specify where on his body Mr. Pulliam experienced reporting the severe pain. More generally, the record also reported Mr. Pulliam's history of IV substance abuse, mostly heroin.

---

[5] Many of the discovery responses were "unknown at this time." Based on one of the responses, counsel for Mr. Pulliam did not even know about Mr. Pulliam's wife and son at that time.

[6] According to the medical records, Mr. Pulliam was homeless at the time of the assault; stayed with this sister briefly; and then went to UMC for treatment.

Another medical record in Exhibit C was a June 2, 2018 progress note authored by Dr. Lacorte, who reported that Mr. Pulliam had "complain[ed] of severe pain to [his] left knee." Dr. Lacorte then related that Mr. Pulliam "[r]eports that a nurse dropped him last night when he was being transferred to the chair. The patient reports he told the nurse he needed a sliding board for the transfer, but they said that sliding boards were locked away and they were unable to access one." Like the record from the day prior, this progress note listed the impression for Mr. Pulliam's left knee as "septic joint."

Also in Exhibit C is a June 20, 2018 radiology report regarding an x-ray Mr. Pulliam underwent that day on his left knee. The report listed the "Reason for Study" as "PAIN/TRAUMA/SWELLING." The report then summarized the results as follows:

> No acute bony injury or dislocation. Alignment is anatomic. Mild narrowing at the medial compartment with sclerosis. Mild osteophytes are also present. There is joint effusion.
>
> **Impression:** No acute bony injury. Moderate degenerative change of the medial compartment. Joint effusion.

Within Exhibit C was Mr. Pulliam's discharge summary from Curahealth dated July 2, 2018. In pertinent part, the discharge summary stated that Mr. Pulliam was "exhibiting pain [medication] seeking behavior."

### The Pulliams' Opposition to Curahealth's Motion for Summary Judgment

On December 23, 2024, the Pulliams filed an Opposition to Curahealth's Motion for Summary Judgment ("Opposition"). To counter Curahealth's argument that they had presented no expert evidence on the standard of care or causation, the Pulliams explained that they had attached two affidavits to their Opposition. The first affidavit was by Dwayne Booker ("Mr. Booker"), who was the nurse that

attempted to lift Mr. Pulliam on June 1, 2018. The second affidavit was by Suzann Pierce ("Ms. Pierce"), whom the Pulliams referred to as their "nursing expert." The Pulliams argued that these affidavits and the medical records attached to Curahealth's Motion for Summary Judgment "clearly demonstrate . . . that the actions and/or inactions of the nurses fell below the nursing standard of care" and "indicate that [Mr. Pulliam] was in 'severe pain' because he was dropped." Accordingly, the Pulliams argued there were disputed issues of material fact precluding summary judgment.

Mr. Booker's affidavit stated that on June 1, 2018, he and a nurse aid "borrowed a sliding board from another patient due to the fact that the sliding boards were locked away . . . and no one had a key" in order to assist Mr. Pulliam with transferring him from his wheelchair to his bed. Mr. Booker attested that although he and the nurse aid placed a sliding board under Mr. Pulliam to facilitate the transfer, "Mr. Pulliam, who was very obese, weighing over 300 pounds, slid off the sliding board onto the floor."

Ms. Pierce's affidavit listed her credentials as "BSN, RN, CLNC," and stated that she "is a Legal Nurse Consultant, and has her own business known as Pierce Legal Nurse Consultants, LLC." Ms. Pierce attested that she had reviewed Mr. Pulliam's medical records and Mr. Booker's affidavit in preparing her affidavit. Ms. Pierce's affidavit then gave a similar account regarding the subject incident as Mr. Booker's affidavit, i.e., Mr. Booker borrowed a sliding board from another patient because the others were locked away. Finally, Ms. Pierce opined "[t]hat knowing that [Mr.] Pulliam was very obese and extremely heavy, the nurse and the nurse aid should have requested additional assistance in transferring [Mr.]

6

Pulliam," such that the failure to do so "was a cause of [Mr. Pulliam]'s fall and fell below the standard of nursing care."[7]

## Curahealth's Reply

On January 6, 2025, Curahealth filed a Reply in support of its Motion for Summary Judgment. Therein, Curahealth objected to Ms. Pierce's affidavit for failure to comply with La. C.C.P. art. 967(A) because 1) it was not based on her own knowledge but instead upon the affidavit testimony of Mr. Booker; 2) Ms. Pierce failed to attach copies of or even identify which medical records she reviewed despite stating in her affidavit that she reviewed medical records; and 3) Ms. Pierce's affidavit contained conclusory allegations, improbable inference, and unsupported speculation.[8] In this latter regard, Curahealth noted that while Ms. Pierce opined Mr. Booker and the nurse aid should have secured additional assistance and the failure to do so fell below the standard of nursing care, she did not specifically identify the appropriate standard of care for a nurse in a rehabilitation hospital. Moreover, Curahealth observed that while Ms. Pierce attested that Curahealth's breach caused Mr. Pulliam's fall, she did not specify what damages and injuries Mr. Pulliam actually sustained as a result of the alleged

---

[7] Though Mr. Pulliam alleged a Curahealth nurse dropped him, we note the parties and the trial court also used the word "fall" to describe the subject incident, and this Opinion will do the same.

[8] Louisiana Code of Civil Procedure Article 967(A) states:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. The supporting and opposing affidavits of experts may set forth such experts' opinions on the facts as would be admissible in evidence under Louisiana Code of Evidence Article 702, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.

7

breach. Finally, Curahealth disputed Ms. Pierce's qualifications to render an expert opinion in this matter, noting the absence of Ms. Pierce's curriculum vitae and any information about her background to establish her ability to opine about the nursing standard of care in a facility like Curahealth. Additionally, Curahealth contended that because Ms. Pierce was a nurse, she was not qualified to offer an opinion on causation because a nurse cannot make a medical diagnosis per La. R.S. 37:913(13).[9]

## Hearing and Judgment

On January 10, 2025, the trial court held a hearing on Curahealth's Motion for Summary Judgment. In discussing Ms. Pierce's affidavit, the trial court stated, in pertinent part, "And while I do see in Ms. Pierce's affidavit that she says they [should have] requested additional assistance, so [I am] assuming -- I have to assume that [that is] the standard of care that [she is] suggesting. But then it says it was the cause of the patient's fall . . . ." The trial court judge further stated, "while you have somebody who [you are] presenting as an expert, [there is] no expert with respect to medical causation." As the trial court further explained, Ms. Pierce "says the attempt to lift [Mr. Pulliam] was the cause of [his] fall, but [there is] no medical causation for linking [an] injury to the fall." The trial court judge noted "the burden is on the plaintiff in a medical malpractice case" and advised counsel

---

[9] Louisiana Revised Statutes 37:913(13) defines "[p]ractice of nursing" as:

[T]he performance, with or without compensation, by an individual licensed by the board as a registered nurse, of functions requiring specialized knowledge and skills derived from the biological, physical, and behavioral sciences. The practice of nursing or registered nursing *shall not be deemed to include acts of medical diagnosis* or medical prescriptions of therapeutic or corrective nature.

(Emphasis added.)

8

for the Pulliams that "[m]edical causation has to be proven by some type of expert testimony." Thereafter, the following colloquy occurred:

> [**Counsel for the Pulliams**]: I have an affidavit from an expert. . . .

> THE COURT: For medical causation. [I am] not talking about the cause of the fall, [I am] talking about medical causation.

> [**Counsel for the Pulliams**]: [Ms. Pierce] puts it in her affidavit.

> THE COURT: Where? Where does she say the plaintiff suffered injuries as a result of the fall?

> [**Counsel for the Pulliams**]: She [did not] talk about the injuries. She said he fell. The injuries are here in the records. Very clear he complained of severe pain to his doctor when he fell on his left knee.

> . . . .

> [**Counsel for Curahealth:**] [The Pulliams'] counsel noted [Mr. Pulliam] complained of severe pain. He complained of severe pain . . . before he was dropped. . . . Again, [Ms. Pierce does not] even say what damages [Mr. Pulliam] actually incurred.

Subsequently, the trial court issued oral rulings.

In terms of Ms. Pierce's affidavit, the trial court ruled:

> [W]hile the Court understands that the documents were not attached that Ms. Pierce refers to, the [c]ourt can certainly disregard . . . portions of the affidavit without the affidavit being thrown out completely. As far as qualifications are concerned she identifies herself with her titles and her designations. Even though I agree that it [does not] reach the level of a full expert opinion type affidavit, . . . I [would not] strike the affidavit on those grounds. So basically the [court is] going to consider certain portions of the affidavit in part, but disregard the portions that do not comply with [La. C.C.P. art.] 967 with respect to attaching the medical records and attaching referenced testimony or statements of Mr. Dwayne Booker.

Then, the trial court listed the "two sticking points" in the case. First, the trial court questioned whether the Pulliams established there was a breach of the standard of care, noting that Ms. Pierce's affidavit merely "suggested that the standard of care

was requesting additional assistance, and that the cause of [Mr. Pulliam]'s fall fell below the standard of nursing care." Second, the trial court noted the absence of "anything with respect to medical causation which requires an expert opinion."

The trial court concluded by orally granting Curahealth's Motion for Summary Judgment and dismissing the Pulliams' claims with prejudice. On January 28, 2025, the trial court issued a written judgment that delineated its oral ruling. The Pulliams' timely appeal to this Court followed.

## ASSIGNMENT OF ERROR

In their brief to this Court, the Pulliams assert one assignment of error. Specifically, they contend:

> The district court erred in granting summary judgment on the issue of medical causation, by ignoring the "common knowledge" exception to the requirement of an expert opinion, as well as the medical records—attached to Curahealth's Motion for Summary Judgment, and admitted into evidence at the hearing—that establish the medical causation of [Mr.] Pulliam's injuries.

Our discussion will begin with the applicable standard of review.

## DISCUSSION

### Standard of Review

"The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action . . . ." La. C.C.P. art. 966(A)(2). It "is favored and shall be construed to accomplish these ends." *Id.* A trial court grants a motion for summary judgment if "[a]fter an opportunity for adequate discovery," the mover's "motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3).

10

On a motion for summary judgment, "[t]he burden of proof rests with the mover." La. C.C.P. art. 966(D)(1). Specifically, the "party seeking summary judgment has the burden of proving there is no genuine issue of material fact." *Barnes v. Turn Servs., L.L.C.*, 2025-0439, p. 10 (La. App. 4 Cir. 9/17/25), ___ So.3d ___, ___, 2025 WL 2658503, at *5 (quoting *Mendoza v. ACE Prop. & Cas. Ins. Co.*, 2024-0604, pp. 9-10 (La. App. 4 Cir. 5/27/25), 414 So.3d 1172, 1180). This Court has previously defined "[a] genuine issue" to mean "a triable issue." *Id.* (quoting *Mendoza*, 2024-0604, p. 10, 414 So.3d at 1180). More particularly, "an issue is genuine if reasonable persons could disagree" about the issue. *Id.* If, however, "reasonable persons could reach only one conclusion" on the particular issue in light of "the state of the evidence," then "[t]here is no need for a trial on [that] issue." *Id.* (first alteration in original). A fact is material when its "existence or non-existence may be essential to the plaintiff's cause of action under the applicable theory of recovery." *Id.* Further, a fact is material when it "potentially insure[s] or preclude[s] recovery, affect[s] a litigant's ultimate success, or determine[s] the outcome of the legal dispute." *Id.* (alterations in original) (quoting *Mendoza*, 2024-0604, p. 10, 414 So.3d at 1180-81). In determining whether "a particular disputed fact is material or not," a court must analyze "the substantive law applicable to the case" as "the applicable substantive law determines materiality." *Id.* (quoting *Mendoza*, 2024-0604, p. 10, 414 So.3d at 1181).

If the movant proves that there is no genuine issue of material fact, thereby satisfying the initial burden of proof, at that point "the burden shifts to the party opposing summary judgment to present factual support sufficient to show he [or she] will be able to satisfy the evidentiary burden at trial." *Id.* at pp. 10-11, ___ So.3d at ___, 2025 WL 2658503, at *6 (quoting *Mendoza*, 2024-0604, p. 10, 414

So.3d at 1181). If the party moving for summary judgment "will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment," then "the mover's burden on the motion does not require him [or her] to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." La. C.C.P. art. 966(D)(1). Only once "the motion has been made and properly supported" does "[t]he burden shift[] from the mover to the adverse party." *Barnes*, 2025-0439, p. 11, ___ So.3d at ___, 2025 WL 2658503, at *6 (quoting *Mendoza*, 2024-0604, p. 11, 414 So.3d at 1181).

When the burden shifts, "the adverse party [must] produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." La. C.C.P. art. 966(D)(1). To produce such support, "[the] adverse party may not rest on the mere allegations or denials of his [or her] pleading, but his [or her] response, by affidavits or as otherwise provided . . . , must set forth specific facts showing that there is a genuine issue for trial." La. C.C.P. art. 967(B). In considering the motion, "the trial court cannot make credibility determinations but must construe reasonable factual inferences in favor of the party opposing the motion, resolving all doubt in favor of the opponent." *Barnes*, 2025-0439, p. 11, ___ So.3d at ___, 2025 WL 2658503, at *6 (quoting *Mendoza*, 2024-0604, p. 11, 414 So.3d at 1181). Once the burden shifts, "summary judgment, if appropriate, shall be rendered against" the party opposing the motion for summary judgment if that party has failed to "set forth specific facts showing that there is a genuine issue for trial." La. C.C.P. art. 967(B). The reason for judgment against the party opposing the motion for

summary judgment at that juncture is because that party has "fail[ed] to provide factual evidence sufficient to establish that he [or she] will be able to satisfy his [or her] evidentiary burden of proof at trial," such that "there is no genuine issue of material fact and summary judgment is appropriate." *Barnes*, 2025-0439, p. 12, ___ So.3d at ___, 2025 WL 2658503, at *6 (quoting *Mendoza*, 2024-0604, pp. 11-12, 414 So.3d at 1181).

On appeal, appellate courts review a trial court's ruling on a motion for summary judgment *de novo* and utilize "the same criteria that govern the trial court's determination of whether summary judgment is appropriate." *Id.* (quoting *Mendoza*, 2024-0604, p. 12, 414 So.3d at 1181). That is, in ascertaining whether summary judgment was appropriate, "an appellate court considers the same questions as the trial court," specifically "whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law." *Id.* With these principles in mind, we turn to the applicable substantive law to determine whether the trial court properly granted Curahealth's Motion for Summary Judgment.

**Burden of Proof/ Medical Malpractice Fault Elements**

In a medical malpractice action, a plaintiff must prove the following three elements to support his or her claim: "(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised"; "(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill"; and "(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." La. R.S. 9:2794(A). To prevail, the plaintiff must prove those

13

three elements "by a preponderance of the evidence." *Moore v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll. o/b/o LSU Health Scis. Ctr.-New Orleans*, 2023-0041, p. 4 (La. App. 4 Cir. 5/4/23), 367 So.3d 777, 781 (quoting *In re Med. Rev. Complaint by Downing*, 2021-0698, 0699, p. 9 (La. App. 4 Cir. 5/26/22), 341 So.3d 863, 870). As explained by this Court, "Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." *Id.* at p. 5, 367 So.3d at 781 (quoting *Schultz v. Guoth*, 2010-0343, p. 7 (La. 1/19/11), 57 So.3d 1002, 1006-07). *See also In re Med. Rev. Complaint by Downing*, 2021-0698, 0699, p. 9, 341 So.3d at 870 (citing *Pfiffner*, 1994-0924, 0963, 0992, pp. 9-10, 643 So.2d at 1234). In this latter regard, "Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence." *Pfiffner*, 1994-0924, 0963, 0992, p. 9, 643 So.2d at 1233-34 (citing *Hastings v. Baton Rouge Gen. Hosp.*, 498 So.2d 713, 719 (La. 1986)).

## <u>Whether the Common Knowledge Exception Has Been Presented for the First Time on Appeal</u>

The above-described exception to the expert testimony requirement in medical malpractice cases is commonly referred to in jurisprudence as the common knowledge exception. As quoted previously, the Pulliams contend the trial court erred by granting Curahealth's Motion for Summary Judgment and thereby "ignoring the 'common knowledge' exception to the requirement of an expert opinion, as well as the medical records" as these are sufficient to "establish the

14

medical causation of [Mr.] Pulliam's injuries." However, in its brief to this Court, Curahealth contends the common knowledge exception was not before the trial court, such that the Pulliams cannot raise this issue on appeal for the first time. Thus, before ruling on the merits of the Pulliams' assignment of error, we must consider Curahealth's contention. If we were to agree with Curahealth, then, as succinctly stated by Curahealth, "procedurally, there are no issues on appeal for this Court to review."

Rule 1-3 of the Uniform Rules of the Courts of Appeal provides, in pertinent part, that "[t]he Courts of Appeal shall review issues that were submitted to the trial court and that are contained in specifications or assignments of error, unless the interest of justice requires otherwise." Under that rule, if an appellant "raises new issues/causes of action that were not previously presented to the trial court as part of the summary judgment motion[] at issue on appeal," then "[g]enerally, [those] issues . . . will not be given consideration for the first time on appeal." *Ruel v. Dalesandro*, 2018-243, p. 8 (La. App. 5 Cir. 7/9/19), 276 So.3d 626, 632 (first citing Uniform Rules, Courts of Appeal, Rule 1-3; then citing *Quality Paint Hardware & Marine Supply, Inc. v. Crescent Coating & Servs., Inc.*, 2013-129, p. 7 (La. App. 5 Cir. 8/27/13), 123 So.3d 780, 785; and then citing *L.R.F. v. A.A.*, 2013-797, pp. 8-9 (La. App. 5 Cir. 2/26/14), 133 So.3d 716, 721). This Court has referred to the rule "that an appellate court will not address an issue raised for the first time on appeal that was not pled, urged, or addressed in the trial court" as "the 'waiver rule.'" *In re Precept Credit Opportunities Fund, L.P.*, 2021-0428, p. 5 (La. App. 4 Cir. 1/19/22), 366 So.3d 409, 413. As this Court has explained in discussing Uniform Rule 1-3, however, "courts look beyond . . . terminology used . . . in pleadings to determine the circumstances and the true nature of the suit."

15

*Cambrie Celeste LLC v. Starboard Mgmt., LLC*, 2016-1318, p. 8 (La. App. 4 Cir. 11/6/17), 231 So.3d 79, 84 (first quoting *Adams v. First Nat'l Bank of Commerce*, 1993-2346, 1994-0486, p. 4 (La. App. 4 Cir. 9/29/94), 644 So.2d 219, 223; and then citing *Scullin Individually and on Behalf of Am. Cos. v. Prudential Ins. Co. of Am.*, 421 So.2d 470, 472 (La. App. 4th Cir. 1982)). Moreover, under the plain language of Uniform Rule 1-3, the appellant need not be the one to have introduced the issue in question to the trial court. Rather, as this Court has held, it is sufficient if the appellee raised the issue in its argument to the trial court and the trial court ruled on said issue in its holding. *See In re Precept Credit Opportunities Fund, L.P.*, 2021-0428, p. 5, 366 So.3d at 413.

Similarly, in *In re Medical Review Panel of Morris*, the appellant contended on appeal that a doctor's testimony would satisfy his burden of proof at trial on a particular issue based on the doctor's deposition testimony. 1996-1771, 1772, p. 5 (La. App. 4 Cir. 11/12/97), 703 So.2d 723, 726. The appellees countered that this Court should not consider the doctor's testimony because the appellant had not presented that evidence or the argument regarding its use in the summary judgment proceedings for which the appellant sought appellate review. *Id.* This Court disagreed and held that "the fact that [the] plaintiff's counsel did not explicitly advance this argument in his opposition to the [appellees' second motion for] summary judgment [did] not preclude . . . consideration of the issue." *Id.* at p. 6, 703 So.2d at 726. This Court noted that the appellant had attached the doctor's deposition testimony in his opposition to the appellees' first motion for summary judgment and that the deposition testimony had been "incorporated by reference on [the appellees'] subsequent motion" for summary judgment." *Id.* Further, in pertinent part, the Court so held that it could consider the doctor's testimony

because when an appellate court reviews a matter *de novo*, it is to "render any judgment which is just, legal and proper upon the record on appeal. *Id.* (quoting La. C.C.P. art. 2164; and citing *Ga. Gulf Corp. v. Bd. of Ethics for Pub. Emps.*, 1996-1907, p. 6 (La. 5/9/97), 694 So.2d 173, 176.).

With these principles in mind, we consider whether either party raised the common knowledge exception before the trial court; whether the trial court ruled on it; and whether the exception's applicability is before this Court. Looking again at the Pulliams' Opposition, they did not specifically raise or reference the common knowledge exception. Instead, the Pulliams focused on arguing in their Opposition that Ms. Pierce's affidavit and the medical records established the causation element of their medical malpractice claim. In its Motion for Summary Judgment, Curahealth argued, in pertinent part, that the Pulliams needed expert testimony to prove their case and that "[t]he sole instance in which expert testimony is not required is a case where a health care provider does *an obviously careless act* from which a layperson can infer negligence." (Emphasis added). In support of this argument, Curahealth cited to *Pfiffner*. Not only is *Pfiffner* the seminal case delineating the common knowledge exception, but also the phrasing in Curahealth's Motion for Summary Judgment—"an obviously careless act"— matches the language used by the Louisiana Supreme Court in discussing the exception in *Pfiffner*. 1994-0924, 0963, 0992, p. 9, 643 So.2d at 1233 (noting that "[e]xpert testimony is not required where the physician does *an obviously careless act*" and then listing examples of same (emphasis added)). Likewise, in discussing the common knowledge exception, the Louisiana Fifth Circuit Court of Appeal ("Fifth Circuit") has explained:

17

The "common knowledge" or "common sense" exception to the rule requiring expert testimony involves factual circumstances in which negligence is obvious. This exception has been recognized by Louisiana jurisprudence in legal malpractice actions where the alleged legal malpractice is obvious or where the defendant committed gross error. The exception has also been applied in medical malpractice where there is *an obvious careless act* such as amputation of the wrong limb or leaving a sponge in a patient's body during surgery.

*Hoffman v. Theriot*, 2017-686, 687, p. 7 (La. App. 5 Cir. 5/30/18), 249 So.3d 297, 303 (emphasis added). Though neither party specifically used the phrase "common knowledge exception" in the Motion for Summary Judgment, the Opposition, or the Reply, we are to look beyond the terminology used in those pleadings to determine the true nature of the issues raised. Clearly, with its contentions in the Motion for Summary Judgment that this case required expert testimony and did not involve an "obviously careless act," as well as the citation to *Pfiffner*, Curahealth sought to establish the common knowledge exception was inapplicable to this case. Therefore, we find Curahealth raised the issue of the common knowledge exception.

Moreover, though the trial court did not explicitly reference the common knowledge exception in its oral or written ruling, the transcript of the hearing reflects the trial court considered whether this case necessitated an expert for the causation issue. As excerpted previously, the trial court noted "[there is] no expert with respect to medical causation" and stated "[there is] no medical causation for linking the injury to the fall." The trial court judge explicitly told counsel for the Pulliams that in this case "[m]edical causation has to be proven by some type of expert testimony." This case is thus analogous to *In re Precept Credit Opportunities Fund, L.P.*, wherein the appellee—rather than the appellant—raised the issue assigned as error on appeal, and the trial court considered the issue. Based

18

on the terminology in Curahealth's Motion for Summary Judgment, the trial court's statements during the hearing, and this Court's jurisprudence (*In re Precept Credit Opportunities Fund, L.P.* and *In re Medical Review Panel of Morris*), we conclude the issue of the common knowledge exception is properly before the Court.[10] Having determined that the issue of the common knowledge exception is properly before the Court, we must next decide whether the exception actually applies to this case as the Pulliams allege it does.

### Whether the Common Knowledge Exception Applies to the Causation Element of Mr. Pulliam's Malpractice Claim

The Pulliams argue the common knowledge exception applies to the causation element of their case because "the average lay person is competent to determine whether [Mr.] Pulliam would have suffered additional pain and injuries after being dropped on his left knee within a month of surgery on that same knee." Curahealth counters the common knowledge exception is inapplicable because "[m]edical expert testimony is required in this matter to show which alleged injuries, if any, can be causally related to the alleged fall versus Mr. Pulliam's pre-existing condition."

Before considering the merits of the parties' arguments, we must consider whether the common knowledge exception is applicable to the causation element of a medical malpractice claim. As stated previously, "[e]xpert testimony is generally required" in a medical malpractice action "to establish the" first and second elements of the claim, namely the "applicable standard of care and whether

---

[10] As in *In re Precept Credit Opportunities Fund, L.P.*, "[a]lthough the circumstances presented here dictate not applying the waiver rule, we acknowledge that it generally applies when a party seeks to switch defenses on appeal." 2021-0428, p. 5, 366 So.3d at 413 n.4 (first *citing McLane S., Inc. v. Bridges*, 2013-1819 (La. App. 1 Cir. 11/3/14), 2014 WL 5588893, at *5; and then citing *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020)).

or not that standard was breached," unless "the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." *Moore*, 2023-0041, p. 5, 367 So.3d at 781 (quoting *Schultz*, 2010-0343, p. 7, 57 So.3d at 1006-07). Though the third and final element, "causation[,] is not explicitly included among those elements for which proof must be made through expert medical testimony, typically expert testimony is required to prove causation when the resolution of that issue is not a matter of common knowledge." *Gleason v. La. Dep't of Health & Hosps.*, 44,947, p. 8 (La. App. 2 Cir. 3/10/10), 33 So.3d 961, 966 (citations omitted). *See also Bozarth v. State LSU Med. Ctr./Chabert Med. Ctr.*, 2009-1393, p. 12 (La. App. 1 Cir. 2/12/10), 35 So.3d 316, 325 (citing *Tillman v. Eldridge*, 44,460, p. 12 (La. App. 2 Cir. 7/15/09), 17 So.3d 69, 77). That is, expert testimony is typically required for a medical malpractice plaintiff to prove the causation element of his claim. Nonetheless, when the situation falls within a lay person's common knowledge, "the exception extends to establishing causation." *Breaux v. Ochsner Clinic, LLC*, 2023-0062, pp. 11-12 (La. App. 4 Cir. 9/29/23), 382 So.3d 889, 896 (citing *Rogers v. Hilltop Ret. & Rehab. Ctr.*, 2013-867, p. 8 (La. App. 3 Cir. 2/12/14), 153 So.3d 1053, 1060).

Jurisprudence demonstrates the common knowledge exception does not apply to the causation element of a medical malpractice plaintiff's claim if that plaintiff "has a complex medical history or complex medical condition." *Slaydon v. River Oaks, Inc.*, 2023-452, p. 7 (La. App. 5 Cir. 4/24/24), 386 So.3d 706, 711. *See also Jones v. Baton Rouge Gen. Med. Ctr.-Bluebonnet*, 2020-1250, p. 7 (La. App. 1 Cir. 6/4/21), 327 So.3d 512, 517 (citation omitted). Rather, in that instance, "[t]he causal connection between [the outcome for the patient and the alleged

malpractice] . . . is simply beyond the province of lay persons to assess." *Pfiffner*, 1994-0924, 0963, 0992, p. 10, 643 So.2d at 1234.

For example, in *Austin v. St. Charles General Hospital*, the plaintiff had a history of back problems originating with an automobile accident in March 1980 and had undergone multiple back surgeries, including fusions in March 1983 and March 1984. 587 So.2d 742, 748-49 (La. App. 4th Cir. 1991). Subsequently, in August 1984, the plaintiff "was brought in a wheelchair from her room [at the defendant facility, St. Charles General Hospital ("St. Charles")] to a waiting area . . . outside of [a] scan room where she was to be tested" for various suspected medical conditions, namely diabetes, ulcers, hypertension, and thyroid problems. *Id.*, 587 So.2d at 744. After the plaintiff underwent her testing, she somehow fell from the scan table when attempting to return to her wheelchair—with trial testimony providing conflicting evidence as to exactly how she fell—and ultimately received a diagnosis of a compression fracture at her L2 vertebra. *Id.*, 587 So.2d at 744, 748. The plaintiff sued St. Charles, ultimately receiving a jury award of damages for personal injuries sustained to her back. *Id.*, 587 So.2d at 744. Despite the plaintiff being overweight and having a history of back problems prior to the fall, the plaintiff supported the causation and damages element of her case with testimony from two doctors. *Id.*, 587 So.2d at 749. One of the doctors "indicated that a trauma[, such as a fall,] superimposed over a fusion would aggravate [the plaintiff's] condition and pain"; "noted a marked difference in the severity of the plaintiff's symptoms after her August . . . 1984 accident"; and "related her compression fracture at L2 to that accident." *Id.* The second doctor "agreed that the plaintiff's accident was a contributory factor to the deterioration of her back" and recommended surgery. *Id.*

21

By contrast, in *Slaydon*, the plaintiff underwent surgery to insert a rod in his left leg and subsequently admitted himself to the defendant facility, River Oaks, Inc. ("River Oaks"), to receive "detox services." 2023-452, p. 1, 386 So.3d at 708. Subsequently, the plaintiff experienced an infection in his left leg, resulting in the amputation of the leg above the knee. *Id.* at p. 1, 386 So.3d at 707. The plaintiff filed a petition for damages against River Oaks and alleged the facility's "negligence" in failing to timely diagnose the infection "caused him to sustain injuries and damages, including the above the knee amputation of his left leg." *Id.* at p. 1, 386 So.3d at 708. In response, River Oaks filed a motion for summary judgment and asserted the plaintiff could not prevail at trial because he had not identified an expert to testify to the elements necessary to meet his burden of proof in a medical malpractice action. *Id.* On appeal, the plaintiff argued the trial court erred in granting River Oaks' motion for summary judgment and in finding that no genuine issues of material fact existed regarding the cause of his damages. *Id.* at p. 3, 386 So.3d at 708-09. More particularly, the plaintiff asserted he did not need to provide expert testimony on the issue of causation because the common knowledge exception applied so as to establish the delayed treatment caused him harm. *Id.* at p. 3, 386 So.3d at 709. River Oaks countered that "expert testimony [was] required because wound healing is a complex medical issue and [the plaintiff] ha[d] a complex medical history." *Id.* The Fifth Circuit agreed with River Oaks, holding that the plaintiff could not meet his burden of proof regarding causation in light of his complex medical history and the complex medical condition presented by his surgical wound. *Id.* at p. 6, 386 So.3d at 710.

In the matter *sub judice*, the medical records attached to Curahealth's Motion for Summary Judgment established that Mr. Pulliam had pre-existing

problems with his left knee. Prior to his admission at UMC, Mr. Pulliam suffered from an assault; had "significant" weakness in his lower extremities; was unable to walk; and "developed severe left knee pain and swelling." Then, Mr. Pulliam underwent surgery on his left knee at UMC, and Curahealth subsequently admitted him as a patient for further treatment on his left knee. The records concerning Mr. Pulliam's admission to Curahealth, i.e., earlier in the day on June 1, 2018, prior to the subject fall, stated "he remain[ed] severely deconditioned to both lower extremities," thus necessitating physical and occupational therapy in the future; listed Mr. Pulliam as "[p]ositive . . . for left knee pain" and "for weakness to both lower extremities"; and noted Mr. Pulliam's lower extremities were "very weak mainly due to pain with active range of motion." Additionally, Mr. Pulliam stated in his Petition that he was wheelchair-bound at the time of his admission to Curahealth. Though the records reflect Mr. Pulliam reported his June 1, 2018 fall to Dr. Lacorte the next day, June 2, 2018, Dr. Lacorte's progress note merely stated Mr. Pulliam was "[c]omplaining of severe pain to the left knee." Nothing in the summary judgment record establishes, however, if this pain differed from the pain Mr. Pulliam was already experiencing in his left knee prior to the fall or connected this pain to the surgery, the fall, or a combination of the two. Stated differently, because Mr. Pulliam complained of left knee pain prior to the fall and generally of "severe pain," it is unclear whether the pain he experienced after the fall was merely a continuation of his post-surgical pain or new, additional pain from the fall. Moreover, Dr. Lacorte's June 2, 2018 progress note lists the same impression regarding Mr. Pulliam's left knee ("septic joint") as the impression in Mr. Pulliam's June 1, 2018 admission note. That is, based on the medical records, Dr.

Lacorte did not change his diagnosis or impression regarding Mr. Pulliam's left knee after learning about Mr. Pulliam's fall and treating him.

Similarly, though Mr. Pulliam underwent an x-ray on June 20, 2018, with the reason for the study listed as pain, trauma, and swelling, the x-ray report states:

> No acute bony injury or dislocation. Alignment is anatomic. Mild narrowing at the medial compartment with sclerosis. Mild osteophytes are also present. There is joint effusion.

> **Impression:** No acute bony injury. Moderate degenerative change of the medial compartment. Joint effusion.

With no further explanation, a layperson will not know what this x-ray report means. A layperson would likely wonder whether such findings indicate any problem at all or a new problem that can be connected to the fall as opposed to Mr. Pulliam's preexisting conditions. A layperson would also likely wonder whether such findings are normal for a male of Mr. Pulliam's age; for someone of Mr. Pulliam's weight; for an individual who was undergoing physical/occupation therapy; for an individual who had been wheelchair-bound; and/or for a post-operative patient who underwent the same type of procedure as Mr. Pulliam.

Without expert testimony as to causation, a lay trier of fact will be unable to ascertain the answers to the above questions and whether the pain Mr. Pulliam experienced after the fall was a result of the surgery he had recently undergone, the fall, or a mix of both. Even if one were to naturally assume that Mr. Pulliam likely experienced pain as a result of the fall, without expert testimony, the trier or fact will be unable to determine to what degree the pain resulted from the fall as opposed to the surgery or ongoing physical/occupational therapy and for how long Mr. Pulliam experienced pain as a result of the fall as opposed to the surgery or ongoing physical/occupational therapy. Considering the foregoing, we find Mr.

Pulliam had a complex medical history insofar as his left knee had been recently operated upon and had been causing him pain and other problems, such that the causal connection between the pain he experienced after the fall and the alleged negligence of Curahealth is simply beyond the province of lay persons to assess and is not demonstrated in the medical records. Mr. Pulliam's history of recent, preexisting problems to the exact body part at issue in his medical malpractice claim prevents application of the common knowledge exception to the facts of this case. Mr. Pulliam's status as someone who had been experiencing lower extremity weakness pre-operation, experiencing an inability to walk pre-operation, and, most importantly, complaining of post-operation pain to his left knee prior to his fall prevents application of the common knowledge exception to the causation element in this case.

Like the plaintiff did in *Austin*, the Pulliams needed to demonstrate how Mr. Pulliam's fall created new or additional pain, problems, or diagnoses for his left knee despite Mr. Pulliam having a recent history of left knee problems. Though that case concerned a jury award after a trial, we included it to demonstrate what a plaintiff like Mr. Pulliam with a pre-existing condition to the body part at issue would have to prove to succeed on the merits. Unlike in *Austin*, nothing in the summary judgment record indicated whether a trauma, such as a fall, superimposed over Mr. Pulliam's operation would have aggravated his condition and pain; noted a marked difference in the severity of Mr. Pulliam's symptoms after the June 1, 2018 fall; related a new diagnosis or level of pain to the fall; or stated the fall was a contributory factor to Mr. Pulliam's knee pain. Mr. Pulliam's case is, instead, more analogous to *Slaydon*. As River Oaks argued in *Slaydon* that expert testimony was necessary because wound healing is a complex medical issue and the plaintiff had

a complex medical history, expert testimony was necessary in the matter *sub judice* because post-operation healing is a complex medical issue and Mr. Pulliam had a complex medical history regarding his left knee prior to the fall. Also, like the plaintiff in *Slaydon*, the medical records from Curahealth reflect Mr. Pulliam had a history of substance abuse and exhibited pain medication seeking behavior upon his discharge from Curahealth on July 2, 2018. A layperson would thus also be unable to determine if Mr. Pulliam's post-fall reports of pain were from the operation, from the fall, or constituted the pain medication seeking behavior referenced in his records.

We also find the cases cited by the Pulliams in their brief to this Court to be distinguishable. In *Estate of Adams v. Home Health Care of Louisiana*, the Louisiana Supreme Court considered the defendant's contention "that the only two experts . . . on plaintiff's witness list were not qualified to testify regarding the causal relationship between [its] negligence and the amputation [of the plaintiff's foot]." 2000-2494, p. 1 (La. 12/15/00), 775 So.2d 1064, 1064. The trial court had granted the defendant's motion for summary judgment, and the Fifth Circuit affirmed that ruling. In reversing and remanding, the Louisiana Supreme Court stated that "[c]ausation is an issue of fact that is generally decided at the trial on the merits." *Id.* Further, the Louisiana Supreme Court explained:

> [T]he admitted negligence clearly caused some damages, even if it merely hastened the amputation by one day. Plaintiff's damages for pain and suffering during the period of negligence, for aggravation of her medical condition, and for loss of any chance of saving her foot or of delaying the amputation is more appropriately decided by trial on the merits, even if plaintiff's case regarding the amount of damages is considerably weakened by the dearth of expert testimony.

*Id.* at pp. 1-2, 775 So.2d at 1064-65. However, one can distinguish the claims in *Estate of Adams* from the matter at hand. In *Estate of Adams*, the plaintiff had

diabetes; developed a blister on her left foot as a result of walking in ill-fitting shoes designed by one of the defendants; and ultimately underwent an amputation of her left leg. 1999-1263, p. 3 (La. App. 5 Cir. 7/25/00), 767 So.2d 855, 856-57. The opinions by the Fifth Circuit and by the Louisiana Supreme Court in *Estate of Adams* reflect the plaintiff suffered from a new wound as a result of the alleged malpractice; an aggravation of existing problems with her left heal, foot, and leg; and potentially the loss of any chance of saving her foot or of delaying her amputation. Here, by contrast, without expert testimony, the record does not specifically reflect if Mr. Pulliam's fall created a new injury, aggravated his preexisting condition, or resulted in any long-term problems. Instead, the medical records reflect Mr. Pulliam complained of left knee pain after the fall just as he had complained of before the fall. Moreover, in its *Estate of Adams* opinion, the Louisiana Supreme Court stated that "[c]ausation is an issue of fact that is *generally* decided at the trial on the merits" but did not go so far as to say that causation is always decided at a trial on the merits. 2000-2494, p. 1, 775 So.2d at 1064 (emphasis added). Had it done so, this would have eliminated the possibility of resolution of a medical malpractice claim via the summary judgment proceeding even if nothing in the record connects the alleged malpractice to any injury or damages suffered by the plaintiff. Such a result is illogical.

In another case cited by the Pulliams, *Breaux*, this Court cited favorably to *Estate of Adams*, but we find *Breaux* distinguishable from the matter *sub judice* for the same reasons *Estate of Adams* is distinguishable. In *Breaux*, nothing in this Court's Opinion established or even indicated that the plaintiff had a preexisting condition that would complicate application of the common knowledge exception as is the case here. By contrast, the plaintiff in *Breaux* had a new, distinct injury,

27

i.e., a fractured bone in his leg. *Id.* at p. 2, 382 So.3d at 891. Moreover, in *Breaux*, this Court dedicated an initial section of the Opinion to explaining "that the nature of th[e] case—an NFL player, as the plaintiff-patient, and a team doctor as the defendant—[was] a relevant factor" in the outcome. *Id.* at pp. 8-9, 382 So.3d at 895 (citation omitted). The Court ultimately held the common knowledge exception applied as the plaintiff endured a new injury (the broken bone in his leg) for which he clearly suffered because his job as an NFL player required him to practice on his injured leg. *Id.* at pp. 14-15, 382 So.3d at 898. In both *Estate of Adams* and *Breaux*, there was a demarcation between the respective plaintiff's status pre- and post-malpractice. Such a distinction is lacking in the matter *sub judice*. While this Court stated in *Breaux* that the Louisiana Supreme Court's *Estate of Adams* opinion meant that court "implicitly rejected the need for expert testimony to withstand summary judgment on a claim for pain and suffering arising out of a medical provider's . . . negligence," both *Breaux* and *Estate of Adams* involved new, distinct injuries that a layperson could assess without a preexisting condition complicating the assessment. Thus, *Estate of Adams* and *Breaux* stand for the implicit rejection of the need for expert testimony to withstand summary judgment on a claim for pain and suffering arising out of a medical provider's uncontested negligence if the pain and suffering is not so commingled with a preexisting condition or complex medical history so as to be beyond common knowledge.

The Pulliams also cited to *Deakles v. Southeast Louisiana Veterans Home*, wherein the Fifth Circuit noted "no evidence was presented by [the defendant] to establish that [the plaintiff's] medical history was so 'complex' that only an expert with medical training could ascertain whether the [defendant's] alleged negligence

was a cause-in-fact of [the plaintiff's] death." 2024-517, p. 5 (La. App. 5 Cir. 2/26/25), 407 So.3d 899, 903-04. Unlike the matter *sub judice* which contains medical records with a summary of the status of the problems with Mr. Pulliam's left knee immediately before his fall, in *Deakles*, "the state of [the plaintiff's] health at the time of the alleged breaches of conduct . . . [was] not clear from th[e] evidence" presented. *Id.* at p. 5, 407 So.3d at 903. Of note, in *Deakles*, the Fifth Circuit held, "It is incumbent upon a plaintiff to prove that [the] defendant's conduct increased the risk of [the] patient's harm such that it was a substantial factor in causing the result." 2024-517, p. 4, 407 So.3d at 903 (citing *Hastings*, 498 So.2d at 720). In the matter *sub judice*, the Pulliams have not even demonstrated what the result of Curahealth's alleged malpractice was as distinguishable from Mr. Pulliam's pre-fall state. That is, Mr. Pulliam complained of left knee pain before the fall and after the fall. He received no new diagnoses. The medical records do not attribute Mr. Pulliam's post-fall left knee pain to the fall. In *Deakles*, in addition to citing favorably to *Estate of Adams*, the Fifth Circuit also quoted from *Hastings* for the proposition that "once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the damage is a question of fact for the jury." 2024-517, p. 4, 407 So.3d at 903. Again, however, the Fifth Circuit made that statement in a case in which the facts did not prevent application of the common knowledge exception. This goes back to the central problem with the Pulliams' case: if the common knowledge exception does not apply and the plaintiff has not secured expert testimony, then how will a layperson as the trier of fact be able to determine if the malpractice contributed to the plaintiff's condition or even caused *any* damage?

In another case cited by the Pulliams, *Ainsworth v. American Home Assurance Company*, this Court held that the plaintiff's claim for physical and emotional symptoms her mother suffered while a patient at Touro Infirmary during Hurricane Katrina and the days that followed were within the common knowledge of an average lay person or trial court to understand. 2017-0778, pp. 10-12 (La. App. 4 Cir. 2/21/18), 239 So.3d 359, 365-66. The Court made the decision "[g]iven the facts presented," noting "[t]he conditions inside Touro [Infirmary] were such that patients were exposed to 'oppressive heat and humidity,' inadequate ventilation, unsanitary conditions, and a lack of provisions." *Id.* at pp. 9, 11, 239 So.3d at 365-66. The Court noted although the plaintiff's mother was no longer alive to testify as to the conditions or her injuries, "the testimony of others provide[d] circumstantial evidence which establishe[d] what happened to [her]." *Id.* at p. 9, 239 So.3d at 365. For the plaintiff's other claim for wrongful death, however, this Court held that whether Touro Infirmary's "alleged negligent acts exacerbated [the plaintiff's] pre-existing condition . . . [was] beyond the province of lay persons to assess," such that expert testimony was necessary. *Id.* at pp. 12-13, 239 So.3d at 366. This is the same result we have reached regarding the Pulliams' claims, i.e., that Mr. Pulliam's preexisting condition results in this case being beyond the province of lay persons to assess. Moreover, as in *Ainsworth*, Mr. Pulliam is no longer alive to talk about his injury. However, unlike in *Ainsworth*, the Pulliams did not offer testimony of others to provide circumstantial evidence regarding Mr. Pulliam's knee pain. The record establishes Dr. Lacorte is no longer alive to talk about Mr. Pulliam's injury nor did the Pulliams secure his deposition testimony prior to his passing. The Pulliams identified no one else to talk about Mr. Pulliam's alleged post-fall injury and damages. The record does not even

30

establish that Mr. Pulliam sought additional treatment for his left knee after his June 20, 2018 x-ray.

In sum, we find the Pulliams' sole assignment of error is without merit. The common knowledge exception is inapplicable to the causation element of Mr. Pulliam's medical malpractice claim. Because the Pulliams needed to prove all three elements to succeed (1. The standard of care; 2. Breach of the standard of care; and 3. Causation), their failure to prove one of the elements—causation—when faced with Curahealth's Motion for Summary Judgment was fatal to their claim. Therefore, we need not consider the other elements, particularly whether Ms. Pierce's affidavit did or did not satisfy the Pulliams' burden of proof concerning the first and second elements. Instead, we hold the trial court correctly granted Curahealth's Motion for Summary Judgment because Curahealth pointed to the absence of factual support for the causation element of Mr. Pullian's medical malpractice claim.

## DECREE

For the foregoing reasons, we affirm the trial court's January 28, 2025 judgment, which granted Curahealth's Motion for Summary Judgment and dismissed the Pulliams' claims with prejudice.

**AFFIRMED**